<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Criminal Action No. 20-598** |
| v. | **FINDINGS OF FACT AND** |
| **KYIEEM NEWSOME,** | **CONCLUSIONS OF LAW** |
| *Defendant.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

Before the Court is Defendant Kyieem Newsome's ("Newsome") Motion to Suppress Evidence pursuant to Federal Rules of Criminal Procedure 12(b) and 41(h), ECF No. 19. For the reasons set forth below, the Motion is **DENIED**.

**I.   BACKGROUND**

On July 15, 2020, a grand jury returned a three-count indictment charging Newsome with (1) possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C); (2) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). ECF No. 1. Newsome was arraigned on October 11, 2020 and pled not guilty. ECF No. 11.

On December 17, 2020, Newsome filed a motion to suppress evidence recovered from his person and automobile following his arrest on January 15, 2020. ECF No. 19. At a four-day evidentiary hearing conducted on November 30, 2021, December 8, 2021, March 22, 2022, and June 8, 2022, the Court heard testimony from three fact witnesses, Detective Fabian Caicedo ("Det. Caicedo"), Officer Richard Brown ("Off. Brown"), and Officer Daniel Valle ("Off. Valle"), and

1

one expert witness proffered by Newsome, retired Police Captain Melissa Fernandez ("Capt. Fernandez").[1] The parties also entered several exhibits into evidence during the hearing, including a police report drafted by Off. Brown and photographs and surveillance footage depicting the scene of Newsome's arrest. Having reviewed all relevant evidence and the post-hearing briefs submitted by the parties, the Court now makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT[2]

### A. The Scene of Newsome's Arrest

1. On the morning of January 15, 2020, Det. Caicedo and Off. Valle were conducting undercover surveillance in Newark, New Jersey on Brookdale Avenue, a one-way street flowing northbound from Abinger Place.  T1 24:1-8; T2 50:2-51:10.

2. Det. Caicedo and Off. Valle were at the scene to observe a house located at 54 Brookdale Avenue ("54 Brookdale") for an investigation unrelated to Newsome.  T1 24:9-13, 25:13-17; T2 95:9-12.[3]

3. Det. Caicedo was familiar with the area of Brookdale Avenue and Abinger Place and knew it to be a high-crime area.  T1 22:20-23:4.[4]  Det. Caicedo had previously conducted several investigations and made multiple arrests in the area.  T1 22:23-25, 37:12-22.

---

[1] The Court refers to the transcript from the November 30, 2021 hearing as "T1," the December 8, 2021 hearing as "T2," the March 22, 2022 hearing as "T3," and the June 8, 2022 hearing as "T4."

[2] The trial court acts as the finder of fact at a suppression hearing, determining the credibility of witnesses and resolving any disputes of material fact. United States v. Howard, 787 F. Supp. 2d 330, 331-32 (D.N.J. 2011). Numerous factors are relevant to credibility, "including the witness's ability to accurately recollect the matters at hand and ultimately, the extent to which the testimony withstands a common sense test of reason and logic." Id. at 332 (citation, quotation marks, and alterations omitted).

[3] Det. Caicedo and Off. Valle were both detailed to the Bureau of Alcohol, Tobacco, Firearms and Explosives while conducting their investigation.  T1 24:14-18; T2 47:9-12.

[4] Off. Brown, the officer who ultimately arrested Newsome, testified similarly.  T1 156:16-24.

4. Det. Caicedo and Off. Valle were located in an unmarked Honda Odyssey minivan with tinted windows (the "Odyssey"). T1 26:19-24.

5. The Odyssey was parked on the left side of the street in front of 47 Brookdale Avenue, facing north in the direction of traffic, and across the street on a "diagonal south a little bit" from 46 Brookdale Avenue ("46 Brookdale"). T1 29:14-20.

6. Footage from security cameras located in the driveways immediately south of 46 Brookdale (the "South Driveway") and immediately north of 46 Brookdale (the "North Driveway") provide a partial view of the events preceding Newsome's arrest. See Gov't Ex. 303A.[5]

**B. The On-Site Officers' Observations**

7. At approximately 8:30 am, Det. Caicedo observed a black Dodge Durango (the "Durango") pull alongside the Odyssey and then reverse into the North Driveway. T1 30:12-24, 31:6-32:3, 120:14-20; Gov't Ex. 101.

8. Several minutes later, a man later identified as Newsome exited the North Driveway and walked south along Brookdale Avenue. T1 35:20-36:6, 38:4-7.

9. Det. Caicedo testified that he was sitting in the driver's seat of the Odyssey, but that he sometimes moved within the passenger compartment, including from the "front to the rear" and "[a]ll the way into the front of the windshield." T1 27:2-4, 52:11-15.[6] Det. Caicedo used binoculars while conducting surveillance. T1 29:22-24.

---

[5] The location of the Odyssey is depicted by surveillance footage from the South Driveway. Tr. 45:3-7, 46:2-13, 51:11-17; see Gov't Ex. 303A (CAM 2). Det. Caicedo also marked the approximate location of the Odyssey on a satellite image of the area. Tr. 28:8-16; Gov't Ex. 100A.

[6] Off. Valle testified that Det. Caicedo remained in the front row of the Odyssey but confirmed that Det. Caicedo was "moving around the van." T2 61:18-21, 101:16-25.

3

10. Det. Caicedo further testified that from his vantage point, he could see the "top of the [Durango]" parked in the North Driveway and the "top of the driver's side door." T1 48:7-13, 52:1-10.

11. Det. Caicedo also had an unobstructed view out of the rear driver's side and back window of the Odyssey, looking south towards Abinger Place. T1 50:13-20; T2 101:10-15.

12. Det. Caicedo testified that shortly after Newsome began walking southward, he saw Newsome engage in a less than a minute encounter about "four or five car lengths" away from the Odyssey, during which Newsome handed "small items" to an unknown person "in exchange for paper currency." T1 38:4-14, 39:10-21; Gov't Ex. 103A.

13. Det. Caicedo attested that he has conducted "hundreds" of narcotics arrests and is familiar with indicators of a hand-to-hand drug transaction, such as "[a] brief conversation, [being] on the phone, waiting for someone, meandering in a certain location, and, of course, the hand-to-hand." T1 20:19-23, 21:9-23.

14. Det. Caicedo identified Newsome's encounter as a hand-to-hand narcotics transaction, noting that while he did not see how much paper currency was exchanged and could not specifically identify the "small items," they "resembled . . . packaged narcotics . . . based on the size and the manipulation of the individual who received it." T1 38:15 39:5, 49:17-50:1.

15. After the first hand-to-hand transaction, Det. Caicedo watched Newsome return to the North Driveway. T1 51:21-25.

16. From his vantage point at the very front of the Odyssey, Det. Caicedo observed the top of the Durango's driver's side door open and close. T1 52:1-15. While Det. Caicedo

could not see the door open fully and could not see Newsome enter the Durango, he testified that he could tell the door was engaged and saw "[Newsome's] head disappear." T1 121:9-19, 122:4-123:10.

17. After returning to the Durango, Newsome exited onto Brookdale Avenue and again walked south. T1 52:20-25.

18. Det. Caicedo then observed Newsome engage in a second hand-to-hand transaction on the sidewalk. T1 53:1-19, 54:11-21; Gov't Ex. 103A.

19. Following the second alleged hand-to-hand transaction, Det. Caicedo watched Newsome return to the Durango. T1 56:5-11.

20. Det. Caicedo explained that based on his experience, "[n]arcotics traffickers like to separate themselves from a larger amount of narcotics" by keeping them in an "area that they can get to quickly but far enough that they can get away from it as well . . . [i]n case of police presence." T1 21:24-22:14. Det. Caicedo noted that indicators of a "stash spot" include a suspect's return to the same spot following hand-to-hand transactions. T1 22:15-19.

21. Based on his observations of Newsome's return to the Durango after hand-to-hand transactions, Det. Caicedo believed Newsome to be using the Durango as a "stash" location. T1 56:13-16, 145:13-16.

22. Det. Caicedo made several additional observations during the approximately 40 minutes he viewed Newsome, including that Newsome (1) met with several other individuals north of the Odyssey's position on Brookdale Avenue, T1 57:18-23;[7]

---

[7] Det. Caicedo did not have a clear view of the meetings north of his position and could not observe any hand-to-hand transactions. T1 57:21-58:7.

(2) continuously looked down Brookdale Avenue towards Abinger Place, T1 58:8-18;[8] and (3) appeared to remove and count several small items from his jacket while standing in front of 46 Brookdale, T1 59:17-60:2.

23. Off. Valle sat in the back row of the Odyssey and looked out of the rear window towards 54 Brookdale. T1 27:5-6; T2 64:18-20. Off. Valle stated that except for the moment that Newsome "first came from the driveway," his vision was focused exclusively on 54 Brookdale. T2 64:7-23.

24. Off. Valle testified that while his view was focused on 54 Brookdale, he also observed Newsome conduct "at least one" hand-to-hand drug transaction within his line of sight. T2 69:20-23.[9]

---

[8] Det. Caicedo attested that based on his training and experience, he believed Newsome was looking down the street against the flow of traffic to look for law enforcement that may be approaching from Abinger Place. T1 58:11-18.

[9] Newsome argues that Off. Valle's account of the location of this alleged transaction conflicts with Det. Caicedo's testimony and undermines Det. Caicedo's credibility. Specifically, Off. Valle and Det. Caicedo were each asked to circle the locations of the hand-to-hand transactions they observed on a photograph of Brookdale Avenue looking south from the general position of the Odyssey. T1 39:10-21, 54:11-21; T2 95:9-17; Gov't Ex. 103A. Det. Caicedo indicated that the two transactions he viewed occurred on the same side of the street as the Odyssey, while Off. Valle circled an area on the opposite side of the street. See Gov't Ex. 103A.

Off. Valle could not recall whether the transaction he observed was also seen by Det. Caicedo, but he remembered Det. Caicedo saying that he observed "other hand-to-hands." T2 74:9-13, 88:22-24. It is thus unclear from the record whether Off. Valle witnessed one of the two transactions attested to by Det. Caicedo or whether he observed a third transaction not seen by Det. Caicedo.

Regardless, to the extent the officers' testimony can be seen as inconsistent, the Court credits Det. Caicedo's testimony over Off. Valle's. Off. Valle testified repeatedly that he was focused almost exclusively on the house at 54 Brookdale and witnessed a hand-to-hand transaction only because it happened to be within his vision. T2 64:7-23, 74:14-75:4, 101:16-21. He was unable to specifically recall any details about the hand-to-hand transaction he witnessed, including the alleged buyer's gender, whether he reported the transaction he witnessed to Det. Caicedo, or where the alleged buyers came from or went to. T2 74:24-75:1, 75:18-24, 77:9-14. By contrast, Det. Caicedo's role in the investigation of 54 Brookdale was to surveil the surrounding area for safety threats, meaning he was able to shift his view and monitor Newsome's movements more closely. T2 101:16-21.

Off. Valle was also uninvolved with Newsome's arrest and the accompanying paperwork, T2 77:22-78:1, 79:14-19, and, importantly, Off. Valle's observations were not cited by law enforcement as a basis for probable cause supporting Newsome's arrest. As set forth below, the Court finds that probable cause was established based on Det. Caicedo's observations alone.

6

### C. Newsome's Arrest and the Search of Newsome's Person

25. After the second alleged hand-to-hand transaction, Det. Caicedo contacted Sergeant Ryan Udvarhely, who directed Det. Caicedo to contact Off. Brown for assistance. T1 64:14-24, 65:7-9.

26. Det. Caicedo advised Off. Brown to respond to 52 Brookdale Avenue, located two houses south of 46 Brookdale, and informed Off. Brown that he had observed a "big guy," dressed in "all black clothing," engaged in potential drug transactions. T1 65:10-24, 67:20-25, 157:20-25, 162:12-21.

27. As Off. Brown drove up Brookdale Avenue from Abinger Place, he "saw a gentleman dressed in all black who matched the description that Detective Caicedo gave [him]," who then "dip[ped] in between houses." T1 167:1-12. From his position driving towards the scene, Off. Brown could not specifically tell where the man went. T1 167:13-18, 167:25-168:7.

28. As Off. Brown approached the Odyssey's position, Det. Caicedo observed Newsome run behind 46 Brookdale and advised Off. Brown that "he is behind 46, keep coming."[10] T1 71:3-15, 168:12-14.

---

[10] Newsome argues that Off. Brown's testimony as to his alleged flight is contradicted by Off. Brown's motor vehicle recording ("MVR"), which depicts Off. Brown's arrival on Brookdale Avenue but does not appear to show Newsome "dipping" behind houses. T1 182:19-23; Gov't Ex. 400; Def. Ex. 400A. Off. Brown testified that based on the positioning of the MVR camera in his vehicle, he "would be able to see things that may not necessarily come up on the camera." T1 183:21-184:7.

The Court is satisfied that Off. Brown's vague observations of an individual dipping behind houses, coupled with Det. Caicedo's more detailed observations of Newsome running behind 46 Brookdale, provide a consistent and credible account of Newsome's initial flight from the scene. The officers' credibility is further corroborated by surveillance video from the South Driveway, which shows Newsome enter and begin to jog down the South Driveway at 9:09 am, roughly 30 seconds before Off. Brown's arrival and in full view of the Odyssey. See Gov't Ex. 303A (CAM 2).

7

29. Det. Caicedo then observed Off. Brown park in the area of 46 Brookdale, exit his patrol vehicle, begin to pursue Newsome behind the houses on Brookdale Avenue, and exit Det. Caicedo's line of sight. T1 71:20-72:18.

30. While in pursuit, Off. Brown observed Newsome "hopping the fences" behind the houses. T1 168:15-169:9.

31. Ultimately, Off. Brown apprehended Newsome in a nearby backyard and placed him under arrest based on Det. Caicedo's observations.[11] T1 169:10-12, 170:19-24.

32. Following Newsome's arrest, Off. Brown's partner conducted a search of Newsome's person and recovered several small plastic jugs containing crack cocaine, approximately $1,059 in cash, and a key fob to the Durango. T1 172:18-21; Gov't Ex. 200 at 3.

**D. Seizure and Search of Durango**

33. After searching Newsome's person, officers conducted a "visual inspection of the [Durango's] passenger compartment," which "revealed a black plastic bag stuffed into the pocket located on the rear of the driver seat as a well as a small, dark-colored, duffle-type bag on the rear passenger seat which was secured to the seat by the seatbelt." Gov't Ex. 200, at 3.[12]

34. Thereafter, law enforcement towed the Durango to a secure impound lot without obtaining a warrant. T1 174:18-19; Gov't Ex. 200, at 3.

35. Approximately eight hours later, a K-9 unit conducted a dog sniff of the Durango, which indicated the presence of narcotics. Gov't Ex. 200, at 3-4.

---

[11] Off. Brown did not personally observe Newsome engage in any criminal behavior. T1 193:5-11.

[12] Surveillance video from the North Driveway shows multiple officers looking into the Durango from 9:17 am to 9:19 am. See Gov't Ex. 303A (CAM 4).

8

36. On January 17, 2020, Off. Brown applied for a search warrant for the Durango, which was issued that day. See Certification of Joshua McMahon ("McMahon Cert.") Ex. D, ECF No. 19.5.

37. On January 19, 2020, law enforcement executed the search warrant and recovered two firearms, ammunition, and narcotics from the passenger compartment of the Durango. See McMahon Cert. Ex. B, ECF No. 19.3.

**E. The Incident Report**

38. Several hours after Newsome's arrest, Off. Brown drafted an incident report detailing the events of January 15, 2020 (the "Incident Report"). Gov't Ex. 200. Neither Det. Caicedo nor Off. Valle drafted written records of their observations. T1 90:14-16; T2 63:8-14.

39. The Incident Report contains one paragraph setting forth a second-hand account of Det. Caicedo's observations. Gov't Ex. 200 at 2-3. Off. Brown's discussion is largely consistent with the live testimony of Det. Caicedo, noting that Det. Caicedo observed Newsome engage in multiple hand-to-hand transactions and return to the Durango. However, the Incident Report differs in two significant ways: first, the Incident Report states that Det. Caicedo observed Newsome meet with and conduct hand-to-hand transactions with three to four individuals, as opposed to the two transactions testified to by Det. Caicedo; and second, the Incident Report states that Newsome opened the rear driver side door when returning to the Durango, as opposed to the front door. Id.[13]

---

[13] The other alleged discrepancies in the Incident Report that Newsome identifies are not inconsistent with Det. Caicedo's testimony and largely immaterial.

First, the report notes that Det. Caicedo observed hand-to-hand transactions "in front of 46 Brookdale Ave.," Gov't Ex. 200, at 3, while Det. Caicedo and Off. Brown testified that the alleged transactions occurred several houses to the south, in the area of 52 Brookdale Avenue, T1 39:10-21, 162:12-15. The Court accepts Off. Brown's explanation that

40. Det. Caicedo testified unequivocally that he only observed two hand-to-hand transactions, T1 123:17-19, but that Newsome briefly met with several other individuals at a distance too far for Det. Caicedo to clearly observe. T1 57:18-58:7.

41. Det. Caicedo also testified that he could not see the rear driver's side door of the Durango and that Off. Brown's report was inconsistent to the extent it suggested otherwise. T1 100:16-18, 123:5-6, 144:15-18.

42. The Court accepts Det. Caicedo's testimony over the inconsistent statements in the Incident Report. Det. Caicedo testified based on his own observations, as opposed to the second-hand account relayed by Off. Brown. While Off. Brown conferred with Det. Caicedo before writing his report, Det. Caicedo did not write any portion of the report and did not review it before it was finalized. T1 75:3-12, 90:17-20. Det. Caicedo's testimony is also consistent with surveillance footage, which shows Newsome opening the front door of the Durango at 8:50 am and 8:53 am but never opening the rear door. See Gov't Ex. 303A (CAM 4). Det. Caicedo also readily admitted that his observations were at times inconsistent with the Incident Report, including by repeatedly testifying that he observed only two hand-to-hand transactions, rather than the three to four reflected in the report. See, e.g., T1 96:11-20, 123:17-19.

---

he listed only 46 Brookdale on the Incident Report because the Durango was parked at that address, T1 176:7-14, and finds that the Incident Report accurately reflects the general area of the alleged transactions.

Second, Off. Brown's report states that he and his partner exited their vehicle "immediately" after seeing Newsome flee between houses, Gov't Ex. 200 at 3, when in fact, the evidence indicates that roughly 30 seconds passed between Newsome's exit off Brookdale Avenue and Off. Brown's arrival on the scene, see supra n.10. The Court declines to adopt Newsome's overly technical definition of the word "immediately" as it is used in the Incident Report and is otherwise satisfied that the precise timing of Off. Brown's exit from his vehicle is not relevant to the instant Motion.

Third, the Court finds the Incident Report's omission of observations made by Off. Valle immaterial because as discussed below, Det. Caicedo's observations alone were sufficient to establish probable cause for both the arrest and subsequent search of the Durango.

### F. Capt. Fernandez's Expert Testimony

43. Following the live testimony of Det. Caicedo, Off. Brown, and Off. Valle, Capt. Fernandez[14] authored an expert report opining that Det. Caicedo could not have seen the front driver's side door of the Durango from his position in the Odyssey (the "Expert Report"). Def. Ex. D-2.

44. Capt. Fernandez visited Brookdale Avenue on December 30, 2021 and attempted to reconstruct the scene on the day of Newsome's arrest. Id. at 2.

45. To determine the location of the Durango and Odyssey, Capt. Fernandez relied on security camera footage from January 15, 2020 and the presence of "unique markers" in the North Driveway. Id. at 4-5. However, because the photographs of the reconstruction supplied in the Expert Reports were taken from different angles than the surveillance videos, the Court finds that they do not accurately reflect the positioning of the vehicles with the degree of accuracy needed.

46. Capt. Fernandez testified that she did not know the exact angle of the surveillance cameras and performed no precise measurements to compare the height and angle of the cameras to the height and angle of her reconstruction. T4 15:15-17:22. She further testified that to the extent she took precise measurements of any kind during her site visit, she destroyed them. T3 67:16-69:22.

47. Capt. Fernandez also did not consider the dimensions of either the Odyssey or the Durango in reconstructing the scene. T3 86:9-87:5.

---

[14] Capt. Fernandez worked for 18 years in the crime scene processing unit of the Union County Sheriff's Office before retiring and entering private practice. T3 10:19-23. The Court accepted Capt. Fernandez as a qualified expert in crime scene reconstruction. T3 28:9-29:1. However, it bears noting that she has no expertise in engineering or similar discipline that would enable her to offer a scientific expert opinion as to the exact location of the vehicles at issue.

48. Capt. Fernandez stated that precise measurements were unnecessary to determine the location of the vehicles because she had surveillance footage reflecting their position. T3 86:19-87:5. She determined the location of the Durango using "photogramic markers" visible in the footage, including cracks in the North Driveway's concrete, the siding of an adjacent house, and a cable hanging from a nearby window. T4 18:7-19:9.

49. Capt. Fernandez took no measurements to determine the positioning of the unique markers relative to each other or to the location of the Durango on January 15, 2020. T4 22:17-24:24. Ultimately, Capt. Fernandez conceded that she "eyeballed" the position of the Durango based on the markers. T4 24:25-25:19.[15]

50. During the suppression hearing, Capt. Fernandez was shown a screenshot from a wide-angled version of Off. Brown's MVR recording when approaching 46 Brookdale on January 15, 2020. See Def. Ex. AB. The screenshot depicts a street level view from Brookdale Avenue into the driveway where the Durango was parked but does not purport to reflect Det. Caicedo's view from the Odyssey. Id.; see T4 90:7-15.[16]

51. Capt. Fernandez testified that based on this new angle, which she had not viewed prior to drafting the Expert Report, her "best guess" was that the Durango was situated even further back in the driveway than she indicated in the report. T4 96:14-97:7.

---

[15] The Expert Report explains how Capt. Fernandez determined the location of the Durango as follows:

> Using unique markings on the concrete of the north driveway, it can be determined with reasonable certainty where the Durango was parked. The camera angle is not perpendicular, so the unique markers were necessary to establish a reliable location. The cable hanging off the house north of the driveway as well as the window/siding were also helpful in establishing the proper position of the Durango.

Def. Ex. D-2, at 4-5. No further details on methodology are provided.

[16] Among other things, the MVR screenshot appears to depict an angle from the center of the street, while the Odyssey was parked on the far side of the street across from 46 Brookdale. Gov't Ex. AB.

12

52. Lastly, Capt. Fernandez noted that a tree was located in front of 46 Brookdale on January 15, 2020, but she made no opinion on whether the tree obstructed Det. Caicedo's view in any way. Def. Ex. D-2, at 8; T3 47:5-7, 75:11-22.

53. The Court finds that Capt. Fernandez's opinion fails to persuasively rebut Det. Caicedo's testimony concerning his view of the Durango. The Expert Report's failure to calculate the size and location of the Odyssey or Durango with any degree of precision undermines its reliability, as does its lack of analysis concerning the angles of the security cameras and the unique markers shown in the surveillance footage. Capt. Fernandez's testimony that the different angle depicted in Off. Brown's MVR footage altered her opinion as to the Durango's position further highlights the importance of using some precision to calculate the angles of camera footage used to reconstruct a scene. Det. Caicedo testified that the scope of his view was extremely limited in that he could see only the "top of the driver's side door" of the Durango when it was engaged. Something more than the approximations supplied by Capt. Fernandez would be needed to show that Det. Caicedo's account is implausible.

## G. Det. Caicedo's Testimony is Credible

54. The Court finds Det. Caicedo's testimony credible for the reasons discussed above and credits his observations of Newsome on January 15, 2020.[17]

## III. CONCLUSIONS OF LAW

55. The Fourth Amendment secures "[t]he right of the people . . . against unreasonable searches and seizures." U.S. Const. amend IV.

---

[17] At the hearing, the Court took judicial notice of Caicedo v. Caicedo, 439 N.J. Super. 615 (App. Div. 2015), a New Jersey state court opinion noting that Det. Caicedo gave testimony conflicting with other witnesses and was found 80% liable by a jury in an unrelated negligence action. The Court finds that the Caicedo action does not meaningfully impact its credibility determination with respect to Det. Caicedo's testimony here.

13

56. While a defendant bears the initial burden to demonstrate that a search or seizure is unreasonable, "[w]arrantless searches and seizures are presumptively unreasonable" unless the Government demonstrates "that one of the exceptions to the warrant requirement applies." United States v. Bey, 911 F.3d 139, 145 (3d Cir. 2018).

57. "[T]he Government must establish by a preponderance of the evidence that 'each individual act constituting a search or seizure' was reasonable." Id.

A. **The Arrest and Search of Newsome's Person**

58. The Government argues that Det. Caicedo's observations provided probable cause to arrest Newsome and search his person without a warrant.

59. "A warrantless arrest of an individual in a public place for a felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003) (citing United States v. Watson, 423 U.S. 411, 424 (1976)).

60. Probable cause for an arrest exists if, based on the events leading up to the arrest, an objectively reasonable officer would have developed "a reasonable ground for belief of guilt" that is "particularized with respect to the person to be searched or seized." Pringle, 540 U.S. at 371 (citations omitted).

61. An officer "may draw inferences based on his own experience in deciding whether probable cause exists." Ornelas v. United States, 517 U.S. 690, 700 (1996) (citation omitted).

62. Unprovoked flight, without more, is insufficient to establish probable cause. United States v. Navedo, 694 F.3d 463, 474 (3d Cir. 2012). However, unprovoked flight can "elevate reasonable suspicion to probable cause" if police otherwise possess

"'reasonably trustworthy information or circumstances' to believe that an individual is engaged in criminal activity." Id. (quoting United States v. Laville, 480 F.3d 187, 194 (3d Cir. 2007)).

63. Similarly, while a defendant's presence in a "high-crime area" is insufficient to establish probable cause or reasonable suspicion standing alone, Illinois v. Wardlow, 528 U.S. 119, 124 (2000), it is a factor relevant to the probable case analysis, see, e.g., United States v. Mackie, 190 F. App'x 178, 180 (3d Cir. 2006).

64. When an officer arrests a suspect "solely on the basis of statements issued by fellow officers," the knowledge of the fellow officers is imputed to the arresting officer, and "[t]he legality of a seizure . . . depends on whether the officers who issued the statements possessed the requisite basis to seize the suspect." Rogers v. Powell, 120 F.3d 446, 453 (3d Cir. 1997) (citing United States v. Hensley, 469 U.S. 221, 231-32 (1985)).

65. Following an otherwise lawful arrest, an officer may conduct a warrantless "search incident to arrest" of the arrestee's person for weapons or destructible evidence. Arizona v. Gant, 556 U.S. 332, 339 (2009).

66. Here, law enforcement had probable cause to arrest Newsome based on the following observations by Det. Caicedo: (1) Newsome twice met with unknown individuals, had brief conversations, and exchanged small items in exchange for paper currency, which Det. Caicedo believed to be hand-to-hand narcotics transactions based on his training and experience, T1 20:19-21:23, 38:4-39:21, 49:17-50:1, 53:1-54:21; (2) Newsome walked up and down Brookdale Avenue several times, briefly met with several different individuals, and periodically returned to the Durango, which Det. Caicedo

believed based on his training and experience to be consistent with the use of a narcotics "stash spot," T1 21:24-22:19, 51:21-25, 56:13-16, 57:18-23; (3) Newsome fled the scene upon Off. Brown's arrival on Brookdale Avenue in a marked police vehicle, T1 71:3-15, 168:12-14; and (4) the area of Brookdale Avenue and Abinger Place is a high crime area, as attested to by both Det. Caicedo and Off. Brown, T1 22:20-23:4, 37:12-22, 156:16-24.  See, e.g., United States v. Cousin, 219 F. App'x 190, 193 (3d Cir. 2007) (finding probable cause to arrest based on "officers' extensive experience, knowledge of the area and of the heightened drug activity present, and direct observation of the suspects acting in a manner consistent with drug traffickers"); Mackie, 190 F. App'x at 180 (finding probable cause to arrest based on an officer's direct observations of a drug transaction in a high crime area and the defendant's flight as police approached).

67. Following the lawful arrest of Newsome, law enforcement conducted a valid search incident to arrest of Newsome's person, recovering drugs, cash, and a key fob to the Durango.  T1 172:18-21; Gov't Ex. 200 at 3.

68. While Det. Caicedo himself neither arrested nor searched Newsome, his knowledge was imputed to other officers at the scene.  See Rogers, 120 F.3d at 453.

69. Consequently, the arrest and search of Newsome were both reasonable under the Fourth Amendment.

**B. Seizure and Search of Durango**

70. The Government argues that law enforcement's seizure and search of the Durango was justified under the automobile exception to the warrant requirement.

71. "The automobile exception permits vehicle searches without a warrant if there is 'probable cause to believe that the vehicle contains evidence of a crime.'" United States v. Donahue, 764 F.3d 293, 299-300 (3d Cir. 2014) (citations omitted).

72. Probable cause to search a location exists where based on the totality of circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

73. Where applicable, the automobile exception "justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Donahue, 764 F.3d at 300 (citing United States v. Ross, 456 U.S. 798, 825 (1982)).

74. Once there is probable cause to search a vehicle, the Fourth Amendment makes no distinction "between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant." Chambers v. Maroney, 399 U.S. 42, 51-52 (1970).

75. Law enforcement had probable cause to seize and search the Durango based on the following facts: (1) Det. Caicedo observed the Durango back into the North Driveway and saw Newsome emerge from that driveway shortly after, T1:30:12-24, 31:6-32:3, 35:20-36:6, 38:4-7, 120:14-20; (2) Det. Caicedo observed Newsome return to and open the front door of the Durango several times, in a manner consistent with the use of the vehicle as a "stash spot," T1 21:24-22:19, 51:21-25, 56:13-16; (3) law enforcement lawfully recovered narcotics and a key fob to the Durango on Newsome's person following the arrest, T1 172:18-21; Gov't Ex. 200 at 3; and (4) before seizing the Durango, officers standing in the North Driveway observed several bags in plain view

within the Durango's passenger compartment,[18] Gov't Ex. 200 at 3; see, e.g., United States v. Burton, 288 F.3d 91, 105 (3d Cir. 2002) (finding probable cause to search address based on evidence suggesting it was being used as a "stash house" for narcotics).

76. Because law enforcement had probable cause to immediately search the Durango, they likewise had lawful authority to seize and impound the Durango while applying for a search warrant. See Chambers, 399 U.S. at 51-52.

77. While law enforcement held the Durango for four days after the seizure before searching it pursuant to a warrant, this delay did not render the continuing seizure of the Durango unreasonable. See Donahue, 764 F.3d at 300-01 (collecting cases and holding that that a five-day delay between seizure and search of a vehicle was "immaterial").

78. Consequently, the seizure and search of the Durango were both reasonable under the Fourth Amendment.[19]

## IV. CONCLUSION

For the reasons stated above, Newsome's Motion to Suppress Evidence, ECF No. 19, is **DENIED**. An appropriate Order will follow.

**Date: August 11, 2022**　　　　　　　　　　　　　　　　*/s Madeline Cox Arleo*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　**MADELINE COX ARLEO**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**

---

[18] The "plain view" exception to the warrant requirement permits officers to look into a vehicle's passenger compartment, so long as they do not enter the vehicle and are lawfully present at their vantage point. See Texas v. Brown, 460 U.S. 730, 740 (1983); United States v. Hankerson, No. 21-418, 2021 WL 4810847, at *6 (D.N.J. Oct. 15, 2021). Newsome has not argued that officers were unlawfully present in the North Driveway or that he had a reasonable expectation of privacy in the curtilage of 46 Brookdale.

[19] As law enforcement had probable cause to search the Durango prior to impounding it, the Court need not address the parties' arguments related to the sufficiency of the search warrant or the extent to which officers relied on the search warrant in good faith.